IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br><br>vs.<br><br><br>SERGIO GELACIO and<br>JUDITH SANTANA,<br><br>Defendants, | **ORDER and<br>MEMORANDUM DECISION**<br><br><br><br><br>Case No. 2:09-CR-78 CW |

This matter is before the court on Defendant Sergio Gelacio's objection to a report and recommendation ("R & R") by Magistrate Judge Robert T. Braithwaite recommending that his motions to suppress be denied. Mr. Gelacio has been charged with possession with intent to distribute five or more kilograms of cocaine. He moved to suppress evidence and statements obtained by the government through the search of a car in which Mr. Gelacio was riding as a passenger and by his own statements and actions while in police custody.

Generally speaking, Mr. Gelacio contends that the police officer's conduct in initiating and conducting the traffic stop and search of the car violated the Fourth Amendment. Mr. Gelacio further asserts that the evidence obtained after he made self incriminating statements at the police station was obtained in violation of *Miranda* because that evidence was gathered after

he invoked his right to counsel and was not provided one. For the reasons set forth below, the court OVERRULES in part and SUSTAINS in part Mr. Gelacio's objections to the report and recommendation.

## I.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(b) requires the court to review "de novo any part of the magistrate judge's disposition that has been properly objected to." Here, Mr. Gelacio has objected to the recommended denial of his two motions to suppress. As part of this review the court "may accept, reject, or modify the recommended disposition." Fed.R.Civ.P. 72(b)(3).

## II.     FACTS

Neither party has suggested that the evidentiary record before Judge Braithwaite requires any supplementation or that any portion of the record should not be considered here. Accordingly, the court bases its factual findings on that record and, to some extent, on the findings in the R & R. This opinion is based upon the facts discussed below: if factual findings contained in the R & R are not repeated herein, the court did not rely on those findings, and if any facts herein that are not in the R & R, they are derived from the record.

### A.      The Stop.

Trooper Nick Bowles of the Utah Highway Patrol has a high degree of experience and training in drug interdiction. On the morning of January 8, 2009, Trooper Bowles was on patrol and driving west on Interstate 70 near Salina, Utah. During his patrol, Trooper Bowles stopped a Mitsubishi Montero driving eastbound because it appeared to have an impermissibly dark front side window. Trooper Bowles stated that he felt confident that the window was too dark for

several reasons: the weather was clear; he got a good look at the Montero; he has made many

such identifications; and the window was so dark that he could not see the car's occupants.

Trooper Bowles pulled over the Montero. When he got to the car, he smelled a strong

odor of air freshener. Judith Santana and Mr. Gelacio were in the Montero. To Trooper Bowles,

they both appeared panicked. Mr. Gelacio's hand trembled.

Trooper Bowles asserted that they were far more nervous than the typical people he stops.

Moreover, Ms. Santana's nervous behavior did not dissipate over time--even after Trooper

Bowles later explained to her that he intended only to issue a warning for the window-tint.

Ms. Santana handed Trooper Bowles a Wisconsin driver's license. Mr. Gelacio gave

Trooper Bowles the Montero's registration, which showed that it belonged to Janet Gelacio.

After he got these documents, Trooper Bowles returned to his patrol car to run normal dispatch

checks and issue Ms. Santana a warning for the window-tint violation. He asked Ms. Santana to

accompany him while he performed these tasks, which is his usual practice.

While waiting for dispatch to provide information and while filling out the warning,

Trooper Bowles talked to Ms. Santana about her travels. Initially, Ms. Santana said she had

driven to Las Vegas with her brother-in-law, Mr. Ge1acio. She explained that Mr. Gelacio and

his wife had planned the trip, but his wife had gotten sick and sent Ms. Santana instead. Ms.

Santana initially said they had been in Las Vegas a few days and agreed with Trooper Bowles

that those days were Tuesday and Wednesday. Shortly afterwards, however, Ms. Santana said

that she and Mr. Gelacio had left Wisconsin on Monday and arrived in Las Vegas on Wednesday.

Since the stop occurred on a Thursday, Trooper Bowles concluded that their stay in Las Vegas

was only one day: Wednesday.  Ms. Santana said that she and Mr. Gelacio had been to Las Vegas to gamble, and that they had stayed at a hotel/casino named Sam's Town.  Trooper Bowles testified that during the stop, Ms. Santana's voice trembled often, that she breathed rapidly, and that she avoided eye contact with him.  He characterized her signs of nervousness as increasing during the initial conversation in his car.

After this discussion, Trooper Bowles received the requested information from dispatch and completed filling out a warning to Ms. Santana for the windshield violation.  The dispatch information revealed that Ms. Santana had a 2001 charge for a drug possession related crime.

After receiving this information, Trooper Bowles returned all of Ms. Santana's documents to her.  When Trooper Bowles did so, Ms. Santana wished Trooper Bowles a good day, got out of his patrol car and walked quickly toward her car.  Trooper Bowles testified that by the time she exited his car, however, he had developed suspicion of illegal activity and wanted to investigate further.  Accordingly, he called to Ms. Santana twice.  She stopped after he called the second time and they met between their cars.  Trooper Bowles asked Ms. Santana if she would talk to him some more, and she agreed.  Trooper Bowles then asked Ms. Santana if he could talk to Mr. Gelacio.  Ms. Santana said that would be fine and returned to the patrol car at Trooper Bowles' suggestion.

Trooper Bowles then went to the Montero and asked Mr. Gelacio if he was willing to talk.  Mr. Gelacio agreed and started to get out of the car, but Trooper Bowles told him to stay in the car.  Trooper Bowles asked Mr. Gelacio about his travels.  Mr. Gelacio's story did not match Ms. Santana's story.  For example, Mr. Gelacio said that he and Ms. Santana went to Las Vegas

to attend the wedding of Ms. Santana's brother at a casino. When Trooper Bowles asked which casino the wedding had occurred in, Mr. Gelacio volunteered information about a baptism in Colorado and about the nature of his wife's illness. Moreover, Mr. Gelacio told Trooper Bowles that he and Ms. Santana had stayed at O'Harrahs in Las Vegas. Further, Mr. Gelacio claimed that he paid for the room in Las Vegas, whereas Ms. Santana claimed that her sister–Mr. Gelacio's wife–paid for the room.

After speaking with Mr. Gelacio, Trooper Bowles returned to his car to talk again to Ms. Santana. Trooper Bowles asked Ms. Santana if they had been to Las Vegas for any reason other than gambling. Ms. Santana said that they had not. Trooper Bowles asked Ms. Santana whether the Montero contained anything illegal and asked specifically about a number of drugs. Ms. Santana answered no to each question except regarding cocaine, to which she answered, "No, nothing." He then asked her for permission to search the car and she agreed.

Trooper Bowles then returned to the Montero to ask Mr. Gelacio more questions. Though Mr. Gelacio denied carrying various drugs, he looked away from Trooper Bowles when he denied having cocaine. Trooper Bowles then asked Mr. Gelacio if he could search the car and Mr. Gelacio agreed.

Trooper Bowles began the search by allowing his narcotics-detecting dog Cica to sniff the Montero. Cica twice paid particular attention to the rear of the vehicle: once trying to get under the rear of the Montero and once "indicating" by barking and scratching. Both behaviors communicated that Cica smelled drugs. Trooper Bowles then began his own search of the rear of the Montero. He noticed that the carpet had been pulled up, poorly returned, and glued down.

There was also a discrepancy in the cargo space of the Montero. Each of these factors indicated that the car had an after-market compartment added to it. Trooper Bowles eventually raised the carpet and found a steel plate sealed by Bondo, an adhesive, which indicated a compartment cover. Trooper Bowles then arrested Ms. Santana and Mr. Gelacio. After doing so, Trooper Bowles took the Montero to a local garage. There, he used the garage's tools to raise the steel plate. Officer Bowles found 21 kilograms of cocaine hidden in the compartment.

Trooper Rod Elmer arrived shortly after Trooper Bowles had arrested Mr. Gelacio and Ms. Santana. Trooper Elmer looked in the Montero's cargo space and concurred that the steel plate indicated an after market-compartment. Trooper Elmer also agreed with Trooper Bowles that the front driver's side window of the Montero was too dark for Utah law.

### B. The Station.

Later, Trooper Elmer interviewed Mr. Gelacio and Ms. Santana at a building occupied by the local county jail and the Utah Highway Patrol. Trooper Elmer spoke for approximately 10 minutes with Mr. Gelacio in Trooper Elmer's office at about 10:00 a.m. Trooper Elmer first asked Mr. Gelacio his identifying and contact information. Trooper Elmer then read Mr. Gelacio the *Miranda* rights. In response, Mr. Gelacio requested a lawyer. Trooper Elmer said that he would stop asking questions about the case, but then continued talking about the case.

First, Trooper Elmer told Mr. Gelacio that he had been caught with 21 kilograms of cocaine. Trooper Elmer said that Mr. Gelacio would be federally charged, that the charge would trigger a 10-year mandatory minimum sentence, that if convicted he would serve a minimum of 10 years since "there won't be any out for good behavior." Trooper Bowles stated that because

Mr. Gelacio had asked for an attorney, Trooper Bowles could not ask questions and if Mr. Gelacio wanted to speak to him without an attorney, Mr. Gelacio would have to initiate the contact and waive his right. Trooper Bowles said that he wanted Mr. Gelacio to "think about that," since if Mr. Gelacio was willing to help him, Trooper Bowles would help Mr. Gelacio "maybe not spend so much time in jail."

Trooper Bowles emphasized that the "window" for cooperating was short, since at the point, no one knew that an arrest had taken place. Trooper Bowles warned Mr. Gelacio that once it became known that he had been arrested, "you probably won't be any good to us" and Trooper Bowles could not help him reduce his sentence. Mr. Gelacio responded that he did not know what to do, and Trooper Bowles responded that he wanted Mr. Gelacio's help setting up a controlled delivery. Trooper Bowles said that it was up to Mr. Gelacio to decide whether to help himself, but affirmed that everyone who had cooperated with him in the past had been grateful that they did.

Mr. Gelacio then asked "what do I get," and said that he had made a "stupid decision" and "pretty much my life was shut down." Trooper Elmer affirmed that Mr. Gelacio had made a "stupid decision," but then stated that he could not talk about the case. In spite of his own acknowledgment that he should not discuss the case, however, Trooper Elmer stated that if the controlled buy was successful, he was certain that Mr. Gelacio's sentence could be "significantly reduced," and that by "significantly, I mean cut years and years and years off your sentence." Trooper Bowles, however, took pains to point out that he could not make such a promise without approval from the prosecutors and without knowing all the information and the prospects of

success.

Mr. Gelacio responded that he did not know the identify of the people to whom he was to deliver the drugs, or the site of the delivery. Trooper Elmer responded that it was only important that law enforcement know that information and that Mr. Gelacio cooperate completely.

Mr. Gelacio again said that he did not want to speak to Trooper Elmer. Trooper Elmer then informed Mr. Gelacio that he was taking him to a jail cell and that he would stop by later to see if Mr. Gelacio had changed his mind about talking without an attorney. Trooper Elmer took Mr. Gelacio to a jail cell, and once there, told Mr. Gelacio that if he wanted to talk more to Trooper Elmer without counsel, Mr. Gelacio should tell the jailers to contact him.

After speaking to Mr. Gelacio, Trooper Elmer spoke with Ms. Santana in his office at about 10:30 a.m. for slightly less than an hour. During that time, Ms. Santana admitted her involvement in the drug delivery and agreed to cooperate with Trooper Elmer. Trooper Elmer then approached the county attorney to request permission for Ms. Santana to speak to Mr. Gelacio about obtaining his cooperation in setting up a controlled delivery. The county attorney approved, and Trooper Elmer presented the idea to Ms. Santana. Trooper Elmer testified that Ms. Santana then requested to speak to Mr. Gelacio.

Following his interrogation of Ms. Santana, Trooper Elmer returned to Mr. Gelacio's jail cell. He asked Mr. Gelacio if he would like to speak with Ms. Santana. Mr. Gelacio agreed. Trooper Elmer then took Mr. Gelacio to his office to speak with Ms. Santana. Trooper Elmer left the two alone in the office with the door closed. After speaking to Ms. Santana, Mr. Gelacio opened the door and asked to speak to Trooper Elmer. Trooper Elmer asked Mr. Gelacio if he

wanted to talk without a lawyer present and Mr. Gelacio agreed.

At about 11:30 a.m., Trooper Elmer joined Mr. Gelacio and Ms. Santana in his office. Trooper Elmer turned on a recorder and again asked Mr. Gelacio if he wanted to talk without a lawyer. Mr. Gelacio again said that he did. When Trooper Elmer asked Mr. Gelacio whether he was being forced to talk, Mr. Gelacio said that he was not. Mr. Gelacio was never re-advised of his rights under *Miranda* and was not given a written waiver of rights.

Once this interview started, Mr. Gelacio admitted to his involvement in drug trafficking and began planning toward a controlled delivery. At approximately 3:00 p.m., Mr. Gelacio made a telephone call to his wife, explaining he had been caught and essentially admitting his guilt. After initially cooperating, however, Mr. Gelacio decided to not go through with the controlled delivery and stopped helping law enforcement officers.

In addition to the cocaine, three cell phones were found in the Montero. One belonged to Mr. Gelacio, one belonged to Ms. Santana, and one was allegedly provided to Mr. Gelacio by the drug organization. Ms. Santana and Mr. Gelacio both agreed to the search of their phones. Mr. Gelacio agreed to the search of the phone at the end the initial interview when he invoked his right to an attorney, and Ms. Santana agreed to the search of her phone during her first interrogation as well. Moreover, both saw Trooper Elmer searching the phones and neither objected. At some point, Mr. Gelacio also provided Trooper Elmer with information about the phones.

## ANALYSIS

In his two motions, Mr. Gelacio seeks to suppress all evidence obtained against him

arising from the traffic stop and at the jail/office on January 8, 2009. With regard to the traffic

stop, Mr. Gelacio argues that the initial stop was improper and that Trooper Bowles improperly

extended the length and scope of the stop resulting his in unlawful continued detention.

Accordingly, Mr. Gelacio argues that all evidence gained through the search of the vehicle must

be suppressed. With respect to the evidence that he provided at the police station, Mr. Gelacio

argues that his rights under *Miranda* were violated because all the evidence was gathered after he

requested a lawyer and was not given one.

On July 12, 2010, Judge Braithwaite issued the R & R, recommending that this court

should deny both of Mr. Gelacio's motions to suppress. Mr. Gelacio filed a timely objection.

This court held a hearing on Mr. Gelacio's objections on September 17, 2010, and after obtaining

the recordings of the stop and the interrogations, took the matter under advisement on October

18, 2010.

## I.        THE INITIAL STOP

Mr. Gelacio contends that it was physically impossible for Trooper Bowles to have had

enough time to reliably conclude that the window tint on the Montero was too dark.

Accordingly, Mr. Gelacio argues that it was improper for Trooper Bowles to pull the Montero

over in the first instance, and all evidence gathered after the initial stop should therefore be

suppressed.

On *de novo* review, the court leaves undisturbed Judge Braithwaite's findings and

conclusions on this specific argument by Mr. Gelacio. The R & R is correct in all material

respects in rejecting this argument. Accordingly, Mr. Gelacio's objections to this part of the R &

R are OVERRULED, and the court adopts the analysis section of the R & R that addresses this argument.

## II.     LENGTH AND SCOPE OF POST-STOP DETENTION

Mr. Gelacio maintains that any evidence obtained after Trooper Bowles issued Ms. Santana the warning should be suppressed because Trooper Bowles improperly extended the scope and purpose of the initial stop.  The R & R found that it was proper for Trooper Bowles to extend the traffic stop for two reasons.  First, the magistrate judge reasoned that Trooper Bowles got consent from Mr. Gelacio and Ms. Santana to continue talking and to search the Montero.  Second, the magistrate judge concluded that Trooper Bowles had a reasonable suspicion of criminal activity, justifying his continued detention and questioning of Mr. Gelacio and Ms. Santana and his running Cica around the car.  The court need not fully address the first ground, because the second ground– reasonable suspicion– is sufficient to overrule Mr. Gelacio's objection to the R & R and deny his motion to suppress.

The R & R concluded that Trooper Bowles had reasonable suspicion to continue the traffic stop beyond its original purpose and scope of warning Ms. Santana that the window was too dark.  In support, the R & R cites several circumstances Trooper Bowles encountered during the entirety of stop on the interstate.  These facts were as follows: the presence of air freshener; the extreme nervousness of Mr. Gelacio and Ms. Santana during the first part of the stop; Ms. Santana's continuing and increasing nervousness in the patrol car; Ms. Santana's drug conviction; the odd and inconsistent travel plans Ms. Santana initially described; the inconsistencies between the stories given by Mr. Gelacio and Ms. Santana; and some additional

statements by Mr. Gelacio that stood out to Trooper Bowles as suspicious.[1]

The court agrees that all of these facts were properly considered in the R & R's reasonable suspicion analysis except for the statements Mr. Gelacio gave to Trooper Bowles after Trooper Bowles spoke to Ms. Santana. That is because those statements were not voluntarily given, as is made clear in *United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006). In *Guerrero-Espinoza*, the Tenth Circuit held that because a passenger in a car did not know that a traffic stop had ended, the passenger's statements to the officer conducting a stop were not voluntary. *Id.* at 1309-10. The facts of *Guerrero-Espinoza* are similar to those here, including the fact that the driver in that case was in the officer's car before and after the stop ended. *See id.*

---

[1] At the evidenitary hearing, Trooper Bowles acknowledged that in assessing whether there was reason to believe that Ms. Santana and Mr. Gelacio were involved in drug running, he considered the fact that Ms. Santana is white and Mr. Gelacio is Hispanic. According to Trooper Bowles, a white women he once caught running drugs with a Hispanic man told him that when such a couple are running drugs together, the white woman drives during the day to appear less suspicious. Trooper Bowles testified that since that conversation, he has always had additional suspicion of drug running when he stops a white woman driving during the day with a Hispanic male passenger. The R & R did not list or rely on the race and sex of Ms. Santana and Ms. Gelacio in analyzing whether Trooper Bowles had reasonable suspicion. To the contrary, Judge Braithwaite expressly rejected these fact as lending any weight to his analysis. This court also refuses to consider those facts. Because Trooper Bowles had no indication that Ms. Santana and Mr. Gelacio in particular were trying to use Ms. Santana's sex and race as a means to allay suspicion, Trooper Bowles' suspicion was nothing more than a mere race- and sex-based hunch. Though Trooper Bowles admitted to relying in part on this hunch, a reasonable suspicion analysis ignores Trooper Bowles' subjective motivations and focuses solely on the objectively suspicious facts available to him. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813-14 (1996) and *United States v. Favela Favela*, 41 Fed. Appx. 185, 190-91 (10th Cir. 2002) (table opinion). Thus, while the court understands Mr. Gelacio's request that Trooper Bowles' impermissible hunch should "cancel out" the objectively suspicious facts and lead to a ruling that he lacked reasonable suspicion, that request does not comport with the law. The court must strongly caution Trooper Bowles, however, that any law enforcement officer's reliance on this type of hunch will almost surely lead to him or her to violate individual rights.

-12-

Because the passenger had no way of knowing that the stop had ended and the officer did not tell

him that it had, the passenger had no way of knowing that he was free to refuse to answer

questions. *See id.* The government's attempt to distinguish *Guerrero-Espinoza* from the present

case is unconvincing. The R & R thus erred in considering Mr. Gelacio's statements to Trooper

Bowles after he had spoken to Ms. Santana in whether there was reasonable suspicion to extend

the traffic stop. Accordingly, this court will disregard the inconsistencies between the statements

of Ms. Santana and Mr. Gelacio and the potentially suspicious statements Mr. Gelacio made to

Trooper Bowles.

After discarding Mr. Gelacio's statements during the traffic stop, the question becomes

whether Trooper Bowles had reasonable suspicion to continue the stop considering the totality of

the circumstances *before* he spoke to Mr. Gelacio. That is, were the air freshener, Ms. Santana's

continuing nervousness, the supposed unusual and inconsistent travel plans she described and her

prior drug conviction enough to create a reasonable suspicion sufficient for Trooper Bowles to

extend the scope of the initial stop and question Mr. Gelacio without his consent and to run Cica

around the Montero? While this is a close case, the answer is yes, with Trooper Bowles'

experience and judgment tipping the scales ever so slightly toward reasonable suspicion.

This conclusion is supported by a recent case involving a traffic stop/drug investigation

also conducted by Trooper Bowles involving strikingly similar facts, *United States v. Simpson*,

609 F.3d 1140 (10th Cir. 2010). In *Simpson*, this court denied a motion to suppress by the

defendant, who Trooper Bowles had pulled over for a traffic violation and continued to detain

and question after the purpose of the initial stop had ended. *See id.* at 1143. The defendant

moved to suppress drugs that Trooper Bowles found after running Cica around his vehicle and conducting a search, arguing that Trooper Bowles lacked reasonable suspicion to prolong the stop and investigate possible drug running. *See id.* In support of the conclusion that he had reasonable suspicion, Trooper Bowles articulated, and this court listed, fifteen facts. *See id.* at 1145. This court further noted Trooper Bowles' experience and training and reasoned that the Tenth Circuit allows some deference to law enforcement officers' judgments concerning what is and is not suspicious. *See id.* Of the fifteen facts this court listed, this court found that four were of particular importance, and that taken together, there was reasonable suspicion. *See id.* This court accordingly denied Mr. Simpson' motion to suppress and he was later convicted of a drug crime.

The Tenth Circuit upheld this court's denial of the defendant's motion. In support, the *Simpson* Court initially noted that it was proper to give some deference to Trooper Bowles' judgment as a law enforcement officer. *See id.* at 1146-47. The court then pared down this court's list of fifteen general facts (of which four were particularly important) to three crucial facts supporting reasonable suspicion. First, the *Simpson* Court pointed out that the defendant had a prior conviction relating to drugs, noting that "criminal history *contributes powerfully to the reasonable suspicion calculus.*" *Id.* at 1147 (citation omitted). Second, the *Simpson* Court relied on the fact that the defendants' extreme nervousness did not dissipate after Trooper Bowles gave him a warning. *See id.* at 1147-48. Third, the court noted that the defendant gave a borderline bizarre travel plan of driving two days from Nebraska to Reno, Nevada to gamble at a friend's house for one night, and then beginning his two day return trip to Nebraska. *See id.* at

-14-

1148-52.  The Tenth Circuit gave little weight to any of the other facts.  *See id.* at 1152.  The

*Simpson* Court then framed the legal question as follows:

> In essence, we are asked to decide whether a police officer who has lawfully stopped a
> person is allowed to continue to detain that person for a short period of time when that
> person has a criminal record of drug trafficking, is acting extremely nervous in a situation
> where others typically relax, and provides evasive answers that describe a fairly
> implausible travel plan.  We must determine whether the Constitution demands that a
> police officer in such a situation to cease the immediate investigation and let that person
> go on his way.

*Id.* at 1153.  The court concluded that "[a]lthough a close call, we conclude that Trooper Bowles

had reasonable suspicion that criminal activity was afoot, and thus, had the right to briefly detain

[the defendant] for further investigation."  *Id.*

The three critical circumstances supporting reasonable suspicion in *Simpson* are closely

mirrored in the present case.  First, Ms. Santana had a prior drug conviction.  While Ms.

Santana's conviction was not related to trafficking drugs like the defendant in *Simpson*, her

conviction did involve drugs.  Second, Trooper Bowles testified that Ms. Santana exhibited signs

of nervousness beyond the usual, and that her nervousness did not subside over the course of her

interaction with him.[2]  Third and finally, Ms. Santana gave internally inconsistent and "fairly

---

[2] The court notes that an officer's attribution of nervousness to an individual is an
extremely weak reed upon which to base a reasonable suspicion.  Without prior experience with
that particular individual, the officer is necessarily speculating about whether such behavior is
abnormal for that person.  Moreover, it is usual for people to be nervous when they have been
stopped by a law enforcement officer, regardless of whether they are engaged in illegal conduct.
Finally, the officer's observation is subjective without verifiable criteria to assess its accuracy.
The officer's after-the-fact explanation often will be without any reasonably means of testing its
credibility.  Considerations such as these have lead the Tenth Circuit to warn caution in using
nervousness as supporting reasonable suspicion.  *See, e.g.*, *U.S. v. Fernandez*, 18 F.3d 874, 879
(10th Cir. 1994).  *See also Simpson*, 609 F.3d at 1147-1148 (nervousness a weak indicator).

In this case, the audio recording of Trooper Bowles' questioning of Ms. Santana in his

implausible" travel plans. *Id.* That is, Ms. Santana at first agreed that she had been in Las Vegas for two days but then detailed a trip that put her there for only one day. Moreover, like the *Simpson* defendant, Ms. Santana described a trip where she drove for two days to spend one night in a Nevada city to gamble, and then immediately began her anticipated two-day drive home. While the *Simpson* Court refused to credit such a story as sufficiently suspicious on its own, the court reasoned travel plans like Ms. Santana's, which are "fairly implausible" and close to "bizarre," may appropriately be given weight when other suspicious facts are present. *Id.* at 1151-53.

As in *Simpson*, this is a close case. Also as in *Simpson*, the deference, albeit limited, that the court is required to give to Trooper Bowles' experience and judgment formed during the stop gives just enough weight to conclude that he had reasonable suspicion. Accordingly, the court finds that under the totality of the circumstances *before* he spoke to Mr. Gelacio and elicited the inconsistent travel plans and other suspicious statements from him, Trooper Bowles had reasonable suspicion to continue his investigation into drug trafficking. Accordingly, Trooper Bowles did not need Mr. Gelacio or Ms. Santana's consent to extend the stop for further questioning and to run Cica around the Montero. Mr. Gelacio's motion to suppress his statements while he was in the Montero[3] and the cocaine found in the Montero is therefore

---

patrol car seems to confirm his assessment that she was extremely nervous, but that conclusion must be made without knowledge of what Ms. Santana's normal speech patterns would be.

[3] To be clear, while the court did not consider Mr. Gelacio's statements during the traffic stop in its reasonable suspicion analysis, that does not mean that those statements must be suppressed.

DENIED.

## III.    EVIDENCE GATHERED AT THE STATION

In addition to the evidence gathered during the traffic stop, Mr. Gelacio moved to suppress any evidence gathered from him or with his assistance after he invoked his right to counsel at the station. The R & R rejected this argument, reasoning that Mr. Gelacio voluntarily waived his right to counsel before he made the self-incriminating statements and cooperated at the station. The R & R further concluded that Mr. Gelacio gave the statements voluntarily. After careful deliberation, the court concludes that the R & R erred as a matter of law on this point.

"If a suspect in the course of custodial interrogation requests a lawyer, *all questioning must cease until a lawyer is obtained or the suspect spontaneously reinitiates the conversation*." *United States v. Hawthorne*, 316 F.3d 1140, 1143 (10th Cir. 2003) (emphasis added, citing *Davis v. United States*, 512 U.S. 452, 458 (1994)). Here, Trooper Elmer admits that Mr. Gelacio unambiguously requested a lawyer after Trooper Elmer informed him of his *Miranda* rights. Trooper Elmer further acknowledges that he did not make any attempt to contact a lawyer for Mr. Gelacio. Instead, Trooper Elmer informed Mr. Gelacio about Trooper Elmer's opinions about the legal significance of the anticipated charges against Mr. Gelacio in terms of possible jurisdiction, sentence and the legal ramifications of cooperation. After Mr. Gelacio persisted in remaining silent unless represented, Trooper Elmer convinced Ms. Santana to cooperate after she waived her rights. Trooper Elmer then arranged for a special meeting between Ms. Santana and Mr. Gelacio in which Trooper Elmer knew and intended that Ms. Santana was going to try to change Mr. Gelacio's mind about cooperating without defense counsel. To accomplish this

meeting, Trooper Elmer went uninvited to Mr. Gelacio's cell and asked Mr. Gelacio if he would like to meet Ms. Santana. Mr. Gelacio's assent to that meeting cannot be said to be reinitiating contact with Trooper Elmer, regardless of whether Trooper Elmer was of the opinion that it would have been acceptable for Mr. Gelacio to refuse.

Given all these circumstances, the court cannot find that Mr. Gelacio spontaneously reinitiated the conversation with Trooper Elmer sufficient to signal a knowing waiver of his right to counsel. There was no significant break in time between the time when Mr. Gelacio invoked his right to counsel and when Trooper Elmer reinitiated contact with Mr. Gelacio. Moreover, Mr. Gelacio's agreement to talk to Ms. Santana was not the equivalent of wanting to speak to the police again. And Trooper Elmer arranged the meeting between Mr. Gelacio and Ms. Santana with the purpose of trying to convince Mr. Gelacio to cooperate. Trooper Elmer knew that Ms. Santana was likely to repeat what she had heard from Trooper Elmer, and it seems quite likely that Trooper Elmer assumed that Mr. Gelacio trusted or had a relationship of confidence with Ms. Santana, since she was Mr. Gelacio's sister-in-law. Further, it denies the reality of the situation to conclude that Trooper Elmer was simply facilitating the requests of Ms. Santana and Mr. Gelacio when he set up the meeting. As the investigating officer with the power to move Ms. Santana and Mr. Gelacio to and from their cells, Trooper Elmer was clearly the one orchestrating each interaction.

In light of all these considerations, the court finds that Trooper Elmer's actions were impermissible attempts at "badgering" Mr. Gelacio to change his mind about wanting an attorney. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990). Accordingly, all evidence gathered

from Mr. Gelacio at the jail/station should be suppressed, including his self incriminating

statements, his statements relating to the information on the cell phone, the search of his cell

phone, and his phone call to his wife.  All of this evidence obtained from Mr. Gelacio after he

asked for an attorney was the a result of the improper denial of counsel to Mr. Gelacio.  The

court comes to this conclusion despite Mr. Gelacio's twice agreeing to speak to Trooper Elmer

with no attorney.  Because Trooper Elmer impermissibly reinitiated contact with Mr. Gelacio,

Mr. Gelacio's agreement thereafter is "presumed involuntary." *McNeill v. Wisconsin*, 501 U.S.

171, 177 (1991) ("If the police do subsequently initiate an encounter in the absence of counsel

(assuming there has been no break in custody), the suspect's statements are presumed involuntary

and therefore inadmissible as substantive evidence at trial, even where the suspect executes a

waiver and his statements would be considered voluntary under traditional standards.")

None of the cases cited by the government in support of its argument that Mr. Gelacio

voluntarily waived his right to counsel apply here.  In *Fox v. Ward*, 200 F.3d 1286, 1297 (10th

Cir. 2000), two officers pulled a prisoner from his cell to introduce themselves and give him their

business cards.  No attorney for the prisoner was present when this happened, although the

prisoner had invoked his right to remain silent and to an attorney.  *See id.*  As the officers left, the

prisoner spontaneously volunteered self incriminating statements.  *See id.*  The *Fox* court

concluded that the motion to suppress those statements had no merit, since the officers could not

have reasonably foreseen that their actions would lead to any incriminating statements by the

prisoner.  *See id.* at 1298.  Here, Trooper Elmer knew– and in fact intended–  that arranging for

Mr. Gelacio to speak to Ms. Santana had a significant chance of resulting in Mr. Gelacio

cooperating without counsel and thereby implicating himself.

Likewise, *United States v. Cook*, 599 F.3d 1208 (10th Cir. 2010) is inapposite. In *Cook*, a prisoner who had invoked his rights to silence and counsel made self incriminating statements to his cellmate. *See id.* at 1211. Unbeknownst to the prisoner, the cellmate had agreed to cooperate with government to elicit such statements from the prisoner. *See id.* at 1211. The prisoner moved to suppress his statements to his cellmate, arguing that the government violated his unambiguously asserted rights by sending in the cellmate, which the district court granted. *See id.* The Tenth Circuit reversed, finding that the motion should have been denied because the prisoner was not subject to custodial interrogation when he made the statements to his cellmate. *See id.* at 1214-15. The *Cook* court reasoned that because the prisoner was "completely unaware that he was in the presence of a government agent" and because the conversation with the cellmate was "casual questioning by a fellow inmate," there was no custodial interrogation "even though the government coordinated the placement of the fellow inmate and encouraged him to question" the prisoner. *Id.* at 1214, 1215.

The government urges the court to extend *Cook* to the present situation. Such an extension is not warranted. Here, it was obvious to Mr. Gelacio that Trooper Elmer was making special arrangements to allow Mr. Gelacio to speak to Ms. Santana. The meeting took place in Trooper Elmer's office. Moreover, the statements about the potential sentence and results of cooperation that Ms. Santana relayed to Mr. Gelacio would likely be the same as those Trooper Elmer relayed him. The conversation between Ms. Santana and Mr. Gelacio was hardly a casual conversation: it is an easy inference to make that Ms. Santana was pleading with Mr. Gelacio to

cooperate in a controlled delivery without the involvement of defense counsel so that she would face a lesser sentence. And Ms. Santana was no random inmate sidling up to Mr. Gelacio in his cell to chat: she was his sister-in-law, and her pleas would likely have an emotional impact on him.

Whether Ms. Gelacio was acting as an agent for Trooper Elmer in a technical sense is not important, so the court need not run through the analysis of *United States v. Taylor*, 800 F.2d 1012 (10th Cir. 1986). The crucial point is that Trooper Elmer arranged a meeting between Ms. Santana and Mr. Gelacio knowing that the purpose of the meeting was for Ms. Santana to try to convince Mr. Gelacio to cooperate in a controlled delivery without the involvement of defense counsel. That meeting could not have been accomplished without Trooper Elmer's repeated interventions. Even if the court were to hold (which it does not) that Trooper Elmer was simply acting as a neutral middleman between Ms. Santana and Mr. Gelacio, there is little doubt that Trooper Elmer knew that his actions in allowing the meeting would be that Mr. Gelacio might change his mind.

### CONCLUSION AND ORDER

For the reasons stated above, the court SUSTAINS in part and OVERRULES in part Mr. Gelacio's objections to the R & R. With respect to Mr. Gelacio's motions to suppress, the court ORDERS as follows:

Mr. Gelacio's motion to suppress evidence obtained from him while at the jail/station (Dkt. No. 38) is GRANTED. That suppression includes all of Mr. Gelacio's statements to police after he invoked his right to counsel are suppressed, all of his statements to his wife, all of the

information he provided about the cell phone, and the search of his cell phone; and

Mr. Gelacio's motion to suppress evidence gathered during the initial traffic stop and the search of the Montero (Dkt. No. 39) is DENIED.

SO ORDERED this 4th day of November, 2010.

BY THE COURT:

_Clark Waddoups_
Clark Waddoups
United States District Judge